# SUPREME COURT OF THE UNITED STATES

## STEVEN DONZIGER *v.* UNITED STATES

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 22–274.   Decided March 27, 2023

The petition for a writ of certiorari is denied.

JUSTICE GORSUCH, with whom JUSTICE KAVANAUGH joins, dissenting from the denial of certiorari.

For decades, Texaco, a corporate predecessor to Chevron, allegedly polluted rain forests and rivers in South America. See *Aguinda* v. *Texaco, Inc.*, 303 F. 3d 470, 473 (CA2 2002). In 1993, residents of Ecuador came to court seeking relief for personal and environmental injuries they said the company had caused. Represented by Steven Donziger, the plaintiffs filed a class-action suit in the Southern District of New York. *Id.*, at 473–474. At the company's insistence, the court transferred the litigation to Ecuador. See *Republic of Ecuador* v. *Chevron Corp.*, 638 F. 3d 384, 389–390 (CA2 2011). Later, Chevron came to regret that move. After trial, it found itself on the wrong end of an $8.6 billion judgment. *Id.*, at 391.

Returning to the Southern District of New York, the company launched a counteroffensive. Ultimately, it won not only an injunction against the enforcement of the Ecuadorian judgment in any court in the United States. See *Chevron Corp.* v. *Donziger*, 833 F. 3d 74, 80 (CA2 2016). It also won a constructive trust on all assets Mr. Donziger received in this or any country as a result of the Ecuadorian judgment. *Ibid.* To enforce that trust, the district court granted Chevron discovery into Mr. Donziger's holdings and ordered him to surrender all of his electronic devices for forensic imaging. See 2021 WL 1845104, *1 (SDNY, May 7, 2021). When Mr. Donziger failed to comply fully with the court's

orders, it held him in criminal contempt and referred the matter to the U. S. Attorney's Office for prosecution. See 38 F. 4th 290, 295 (CA2 2022). After some deliberation, however, the U. S. Attorney "'respectfully declined'" to take up the case. *Ibid.* (alteration omitted).

Apparently displeased with this decision, the district court responded by setting up and staffing its own prosecutor's office. *Ibid.* In the bench trial that followed, that office secured a conviction and the court sentenced Mr. Donziger to six months in prison. *Ibid.* Throughout these proceedings and on appeal, Mr. Donziger objected. He argued that the district court had no lawful authority to override the Executive Branch's nonprosecution decision and that our Constitution's separation of powers exists in no small measure to keep courts from becoming partisans in the cases before them. Despite his arguments, the Second Circuit affirmed Mr. Donziger's conviction. *Id.*, at 306. Judge Menashi dissented. *Id.*, at 306–315.

Today, the Court denies Mr. Donziger's petition seeking review of the Second Circuit's decision. I would grant it. In *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787 (1987), this Court approved the use of court-appointed prosecutors as a "last resort" in certain criminal contempt cases. *Id.*, at 801. But that decision has met with considerable criticism. As Members of this Court have put it, the Constitution gives courts the power to "serve as a neutral adjudicator in a criminal case," not "the power to prosecute crimes." *Id.*, at 816 (Scalia, J., concurring in judgment). The Second Circuit acknowledged, too, that *Young* stands in considerable "tension" with this Court's subsequent separation-of-powers decisions. 38 F. 4th, at 303; see, *e.g.*, *Collins* v. *Yellen*, 594 U. S. ___ (2021); *United States* v. *Arthrex, Inc.*, 594 U. S. ___ (2021); *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. ___ (2020); *Lucia* v. *SEC*, 585 U. S. ___ (2018).

Even taking *Young* on its own terms, it is hard to see how

that decision could justify what happened here. *Young* rested on the premise that the court-appointed prosecutors in that case wielded *judicial power*, meaning they were subject to judicial, not executive, supervision. See 481 U. S., at 795–796. By contrast, "[e]very court and every party" has acknowledged that the court-appointed prosecutors in this case did *not* exercise judicial power. 38 F. 4th, at 306 (Menashi, J., dissenting). Instead, all agree, the court-appointed prosecutors here exercised "*executive* power" and were accountable through the Executive Branch's chain of command running ultimately to the President. *Id.*, at 306–307 (emphasis added). By its own terms, then, *Young* simply does not speak to Mr. Donziger's situation.

Nor without *Young* is it clear what legal principle could sustain Mr. Donziger's conviction. Highlighting the confused (but surely executive) nature of the prosecution in this case, the "United States" supplied the Second Circuit with two different briefs offering different theories. One brief came from the court-appointed prosecutors, another from lawyers within the Department of Justice.

Adopting one of the court-appointed prosecutors' theories, the Second Circuit reasoned that those who prosecuted Mr. Donziger served as properly appointed "inferior officers" of the United States within the Executive Branch. 38 F. 4th, at 296–299. But under the Constitution's Appointments Clause, "Courts of Law" may appoint inferior officers *only* when "Congress . . . by Law vest[s]" them with that authority. Art. II, §2, cl. 2. All of which raises the question: Exactly what law gives federal district courts the extraordinary power to appoint inferior executive officers to serve as prosecutors in proceedings before them?

The Second Circuit pointed to Federal Rule of Criminal Procedure 42. That submission, however, faces at least two challenges. First, in *Young* this Court *rejected* the notion that the then-existing version of Rule 42 could serve as an independent font of appointment authority. 481 U. S., at

794; see *id.,* at 815, n. 1 (opinion of Scalia, J.). After all, "it is a Rule of court rather than an enactment of Congress," and therefore it cannot "confer Article II appointment authority" on anybody. *Id.*, at 816, n. 1. Second, courts have adopted Rule 42 under the Rules Enabling Act. That statute provides that any rules of court promulgated under its terms "shall not abridge . . . or modify any substantive right." 28 U. S. C. §2072(b). Yet, the manner in which the Second Circuit applied Rule 42 had just that impermissible effect. The "decision of a prosecutor . . . *not* to indict" is one that belongs squarely within "the special province of the Executive Branch." *Heckler* v. *Chaney*, 470 U. S. 821, 832 (1985) (emphasis added). This "structural principl[e]" serves to "protect the individual" just as much as the Executive Branch. *Bond* v. *United States*, 564 U. S. 211, 222 (2011). By interpreting Rule 42 as authorizing courts to make their own decision to initiate a prosecution—and even to override a contrary decision by the Executive Branch— the Second Circuit's opinion not only arrogated a power to the Judiciary that belongs elsewhere. It allowed the district court to assume the "dual position as accuser and decisionmaker"—a combination that "violat[es the] due process" rights of the accused. *Williams* v. *Pennsylvania*, 579 U. S. 1, 9 (2016).

Seeking to avoid these problems, lawyers from the Department of Justice advanced other theories in their own brief before the Second Circuit. Most pertinently, they suggested that the court-appointed prosecutors did not serve as inferior officers for purposes of the Appointments Clause; instead, they served only as nonofficer employees in the Executive Branch. But not only is this position inconsistent with how the Second Circuit viewed the matter. See 38 F. 4th, at 299. It is hard to square with our own precedent. See *Morrison* v. *Olson*, 487 U. S. 654, 670–671 (1988) (holding an independent counsel to be an inferior officer). And even overlooking all that, the notion that the Constitution

allows one branch to install nonofficer employees in another branch would come as a surprise to many. Who really thinks that the President may choose law clerks for my colleagues, that we can pick White House staff for him, or that either he or we are entitled to select aides for the Speaker of the House?

However much the district court may have thought Mr. Donziger warranted punishment, the prosecution in this case broke a basic constitutional promise essential to our liberty. In this country, judges have no more power to initiate a prosecution of those who come before them than prosecutors have to sit in judgment of those they charge. In the name of the "United States," two different groups of prosecutors have asked us to turn a blind eye to this promise. Respectfully, I would not. With this Court's failure to intervene today, I can only hope that future courts weighing whether to appoint their own prosecutors will consider carefully Judge Menashi's dissenting opinion in this case, the continuing vitality of *Young*, and the limits of its reasoning. Our Constitution does not tolerate what happened here.